John N. DEOUDES and John D. Cokimos, trading as D. C. Novelty Company, Appellants,

v.

G. B. MACKE CORPORATION, a Delaware corporation, Appellee.

No. 2356.

Municipal Court of Appeals for the District of Columbia.

Argued March 23, 1959.

Decided July 7, 1959.

Leonard C. Collins, Washington, D. C., for appellants.

Francis J. Robinson, Washington, D. C., for appellee.

Before ROVER, Chief Judge, and HOOD and QUINN, Associate Judges.

HOOD, Associate Judge.

Appellee, The G. B. Macke Corporation, hereafter referred to as Macke, sued appellants Deoudes and Cokimos, a partnership, trading as D. C. Novelty Company, hereafter referred to as D. C. Novelty, alleging that D. C. Novelty had unlawfully interfered with the contract relationship between Macke and one Gogos. Trial resulted in a judgment for damages in favor of Macke and D. C. Novelty has appealed.

The record contains no statement of proceedings and evidence or transcript of the testimony and the only record which we can consider is the trial court's findings of

fact and conclusions of law.[1] Our question is whether the findings of fact support the judgment.

The findings disclose that Gogos operated two restaurants and on December 14, 1956, she entered into a contract with Macke by which it was given exclusive rights for one year to place its cigarette vending machines in the two restaurants. On June 5, 1957, the contract was extended to December 14, 1958. For some time prior to January 10, 1958, D. C. Novelty was doing business with Gogos, placing and servicing juke boxes at the two restaurants. On January 10, 1958, Gogos sought a loan from D. C. Novelty and, representing that her contract with Macke had expired, offered as consideration for the making of the loan to give D. C. Novelty a contract to place its cigarette vending machines in her two restaurants. As a result D. C. Novelty made the loan to Gogos and obtained from her a contract dated January 10, 1958, for the exclusive privilege for one year of placing its machines in the restaurants.[2] On January 13, 1958, Macke's counsel notified D. C. Novelty's counsel that Macke's contract with Gogos had not expired. Nevertheless, on January 20, 1958, Gogos took Macke's machines out of operation, and pushed them aside, and on that date D. C. Novelty's machines were placed in the restaurants. Thereafter, at the request of Gogos, Macke removed its machines.

The trial court also found that in June 1957 D. C. Novelty knew that Macke's machines were in the restaurants under a contract with Gogos; that prior to January 10, 1958, D. C. Novelty knew that Macke's contract with Gogos contained a renewal clause,[3] and that on January 10, 1958, D. C. Novelty knew that Macke's machines were in the restaurants. The court further found "no actual malice, or willful or wanton disregard" by D. C. Novelty of Macke's rights, but found that D. C. Novelty placed its machines in the restaurants "solely in the belief that they did so in furtherance of their own contract rights."

On the above findings the court concluded that D. C. Novelty "interfered with the contract relationship" between Macke and Gogos, "preventing performance of the existing contract." Accordingly the court awarded damages to Macke.

While the authorities are not entirely in accord on all phases of the subject dealing with the law concerning liability for interference with contractual relations, we believe that it is correctly stated in 1 Harper & James, Torts, § 6.5 (1956) that: "The core of this protection is to be found in the common law tort principle that one who intentionally induces another to break a valid contract is, unless his conduct is privileged, liable for damages legally caused thereby."[4] We think it is generally agreed that one cannot intentionally induce the breach of a contract if he has no knowledge of the contract. "All that the law requires as essential to establish intentional action on the part of the defendant company to act

1. The record contains much immaterial matter, such as a deposition before trial of Gogos, a motion for summary judgment which was denied, and the first and amended findings of fact and conclusions of law which were superseded by a second amended findings of fact and conclusions of law.

2. The making of a loan in connection with these contracts appears not to be unusual, as Macke had made a loan in order to obtain the extension of its contract.

3. The term "renewal clause" does not refer to the extension agreement of June 1957, but refers to a printed clause in the original contract providing for automatic renewal unless terminated by one of the parties on thirty days' notice. This clause is apparently not uncommon as it appears in both Macke's and D. C. Novelty's contracts.

4. See also Restatement, Torts, § 766; 86 C.J.S. Torts § 44; Annotation 26 A.L.R. 2d 1227; Prosser, Torts, § 106 (2d ed. 1955).

in a manner which would induce the breach of plaintiff's contract is a knowledge of the contract rights of the plaintiff, and that plaintiff's contract was still in effect." Meyer v. Washington Times Co., 64 App. D.C. 218, 222, 76 F.2d 988, 992, certiorari denied 295 U.S. 734, 55 S.Ct. 646, 79 L.Ed. 1682. "If defendant, knowing of the contract, deliberately induced the ball-player to break that promise, defendant behaved tortiously." Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 2 Cir., 202 F.2d 866, 867–868, certiorari denied 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343. It is "an indispensable condition precedent to liability for interference with the performance of one's contract," that "there not only must be knowledge of the contract, but there must be an intentional interference therewith." Donovan Construction Co. v. General Electric Co., D.C.Minn., 133 F.Supp. 870, 874.

Our question then is do the findings here establish that D. C. Novelty knew of the contract of Macke with Gogos and did it intentionally cause Gogos to break the contract.

Although the court found that D. C. Novelty knew that Macke's machines were in the restaurant under contract with Gogos, it also found that on January 10, 1958, Gogos represented to D. C. Novelty that Macke's contracts had expired and solicited a loan from D. C. Novelty in consideration of giving it the contract, and found no willful disregard of Macke's rights by D. C. Novelty. From this we must assume that D. C. Novelty at the time it made its contract with Gogos did not know that Macke's contract was still in existence and in good faith relied on Gogos' representa-tion that Macke's contract had expired. The court did not make a finding, which some courts have held sufficient, that D. C. Novelty had reasonable grounds for believing that Macke's contract had not expired.[5] The effect of these findings is that when D. C. Novelty made this contract it had no knowledge of Macke's contract and the making of the contract was not a willful or intentional interference with Macke's contract.

Macke argues, however, that because D. C. Novelty was advised of the Macke contract before it placed its machines in the restaurants, the placing of the machines in the restaurants constituted a willful interference. But when D. C. Novelty installed its machines it was then acting in compliance with its contract which, as we have seen, was not an intentional interference. Enforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract.

Bearing in mind that Gogos sought out D. C. Novelty, that D. C. Novelty acted on Gogos' representation, that D. C. Novelty did not know that Macke's contract was still in existence until after making its own contract and advancing a loan on the strength thereof, we see no intentional or willful interference by D. C. Novelty with Macke's rights. And apparently the trial court so found, because its conclusion was that D. C. Novelty had "interfered"—not intentionally interfered—with the contract relationship between Macke and Gogos. In the absence of intentional interference there was no liability.

Reversed with instructions to enter judgment for appellants.

---

5. See statement in Prosser on Torts (2d ed.) § 106, page 734, that intentional interference "presupposes knowledge of the plaintiff's interests, or at least of facts which would lead a reasonable man to believe in their existence."